A11A2345. PENNINGTON v. THE STATE.
(723 SE2d 13)

ELLINGTON, Chief Judge.

A Gwinnett County jury found Derek Pennington guilty beyond a reasonable doubt of false imprisonment, OCGA § 16-5-41 (a); burglary,

OCGA § 16-7-1 (a); and aggravated assault, OCGA § 16-5-21 (a) (2). He appeals from the denial of his motion for new trial, contending that the evidence was insufficient to support his convictions and that he received ineffective assistance of trial counsel. For the following reasons, we affirm.

1. Pennington contends that the State presented insufficient evidence to support his convictions, arguing that the victim's pre-trial statements to police officers and her trial testimony were inconsistent, there was insufficient evidence to identify him as the perpetrator of the attack, and the testimony of one witness was improperly influenced by the prior testimony of other witnesses.[1]

When a criminal defendant challenges the sufficiency of the evidence supporting his or her conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979). It is the function of the jury, not this Court, to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the evidence. Id. "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." (Citation and punctuation omitted.) *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001). Viewed in this light, the record reveals the following facts.

In May 2006, the female victim lived with her three children in a Lawrenceville duplex, located in Gwinnett County. Pennington lived with his brother, who had a serious chronic illness, and their mother in a duplex that was next to the victim's. The victim met Pennington two or three months before the incident at issue here, and he subsequently went to her home two times to ask for $10 so that he could buy gas. Both times, Pennington asked the victim to have dinner with him, but the victim declined, telling him that she had a boyfriend.

At approximately 3:00 a.m. on May 6, 2006, the victim suddenly woke up to find a man sitting on top of her, straddling her, and holding down her arms. Because her television set was on and provided some ambient light and the attacker's face was no more than 18 inches from hers, she was able to see him and observed that he had a gray beard, had tattoos on his arm, smelled heavily of beer, and had a deep voice. She recognized the man as her neighbor, Pennington. Pennington put a large towel over her face and wrapped

---

[1] See Division 2, infra, regarding the alleged error associated with this testimony.

it behind her head, tightening it so that the victim felt as though she was suffocating. As the victim struggled, she called out that she knew who he was and asked him to leave because her children were in the next room. Pennington repeatedly told her not to look at him and to be quiet, but when she insisted that she knew him, he let go of the towel and left the room.

Immediately after the attack, the victim discovered that her back door was wide open. She ran back to her bedroom to call 911 and discovered that her cell phone had been taken off her nightstand. She called the police on a different phone, and, when they arrived, she showed them that it appeared the intruder had come in through her kitchen window, which did not have a lock and had been opened by someone else after she went to bed, and had left through her back door. While talking to the officers, she found her cell phone on the kitchen counter, near the window. On the porch just outside the back door, the officers found a plastic bag that contained what was later determined to be cocaine residue. According to the victim, she told the officers that Pennington was her attacker and that the cocaine was not hers, but they did not appear to believe her and left after only a few minutes, without collecting any physical evidence, taking photographs, or checking for fingerprints.

The victim immediately called her sister, told her about the attack, and said that she knew the attacker. The sister testified that the victim was crying and was upset because the police officers were leaving, even though they had done nothing about the attack. The victim's sister then called the officers' supervisors and the police precinct to complain about the officers' response to her sister's 911 call; she also called her (and the victim's) father.

In the meantime, after calling her sister, the victim looked around her home and realized that Pennington had taken some of her jewelry and $130 in cash from her wallet, which had been taken out of her purse and thrown on her bedroom floor. She also found a cigarette lighter on the back porch, close to where the officer had found the plastic bag containing cocaine residue. At approximately 3:45 a.m., the victim's father arrived at the victim's home and nailed the kitchen window shut. About 15 minutes later, the father saw a thin, white male wearing a white t-shirt jump into a black van with another person and leave Pennington's house very quickly. The van returned at about 4:30 a.m.

In response to the victim's family's complaints to the police precinct, the same officers returned to the victim's home at about 5:30 a.m., almost two and one half hours after the attack. They took the victim's written statement, and she updated them about what she had found, showed them the lighter, and told them it was not hers. Even so, according to the victim, they picked up the lighter and

"handled it all over" without any apparent attempt to protect or secure possible fingerprints.

As the officers were leaving the victim's home at approximately 5:45 a.m., Pennington was standing in front of his duplex with his dog. The victim saw him and told the officers that he was her attacker. Pennington had a gray beard and tattoos on his arm and, thus, matched the victim's description of her attacker. The officers approached and talked to Pennington; according to the officers, they did not notice the odor of alcohol on Pennington, who appeared to them to be sober. In response to the officers' questions, Pennington said that his brother had become very ill during the night and that he started driving his brother to the hospital in his van. At some point during the drive, which typically takes less than ten minutes, Pennington's brother started to feel better, and they turned the van around and went home. As a consequence, there was no documentation of a hospital visit to corroborate Pennington's claim.

About seven hours after the attack, an investigator presented the victim with a photographic lineup to see if she recognized her attacker; she chose the photograph of Pennington. The investigator met with Pennington later that day and conducted a videotaped interview; the videotape was played for the jury.[2] Immediately after the interview, the investigator placed Pennington under arrest.

At trial, in support of his alibi defense, Pennington called his brother as a witness. According to the brother, at some point between 1:00 a.m. and 3:00 a.m. on May 6, 2006, he experienced severe stomach pain and was spitting up blood. Pennington started driving him to the hospital, but, about halfway there, his brother started feeling better, so they turned around and went back home.

Although Pennington argues on appeal that there was insufficient credible and admissible evidence to show that he was the victim's attacker and to support his convictions, determinations of witness credibility and the weight to give the evidence presented is solely within the province of the jury. *Jackson v. Virginia*, 443 U. S. at 319 (III) (B). Here, defense counsel thoroughly cross-examined the victim, the responding officers, and the investigator regarding the victim's demeanor after the attack, her description of the attack and the attacker, and the inconsistencies between what she told each of them. Counsel also repeatedly emphasized the inconsistencies and attacked the credibility of the victim and her father during closing arguments.

Given the evidence presented, we conclude that it was sufficient for a rational factfinder to find Pennington guilty beyond a reason-

---

[2] Neither the videotape nor a transcript of the interview is in the appellate record.

able doubt of the crimes charged. *Jackson v. Virginia*, 443 U. S. at 319 (III) (B). Therefore, the trial court did not err in denying his motion for new trial on this ground.

2. Pennington contends that his trial counsel provided ineffective assistance due to her failure to invoke the rule of sequestration at the beginning of the trial. According to Pennington, counsel's failure to invoke the rule of sequestration resulted in a witness testifying and directly refuting his alibi defense *after* the witness had been sitting in the courtroom during opening statements, when counsel told the jury that this was a case of mistaken identity and described Pennington's alibi, and the testimony of four other witnesses. Pennington argues that, as a result, the trial court erred in denying his motion for new trial on the basis of ineffective assistance of counsel.

> In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984)[.] The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct. [As the appellate court, we] accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.

(Citations and punctuation omitted.) *Robinson v. State*, 277 Ga. 75, 75-76 (586 SE2d 313) (2003).

OCGA § 24-9-61 provides that, in all cases, "either party shall have the right to have the witnesses of the other party[3] examined out of the hearing of each other. The court shall take proper care to effect this object as far as practicable and convenient, *but no mere irregularity shall exclude a witness*." (Emphasis supplied.) "The purpose of the rule of sequestration is to prevent a witness who has not testified from having his testimony affected by that of another witness." (Citation and punctuation omitted.) *Hollis v. State*, 295 Ga. App. 529, 530 (1) (672 SE2d 487) (2009).

In this case, the record shows that, during an overnight recess following the first day of the trial — after the victim and three other

---

[3] OCGA § 24-9-61 includes an exception for the victim(s) of a criminal offense. See OCGA § 24-9-61.1.

witnesses had testified — the victim's father called the prosecutor and told him that he had gone to his daughter's home shortly after the attack in order to fix her window. While there, he saw a vehicle at Pennington's home leave about 4:00 a.m. and return about 4:30 a.m., which the prosecutor believed was relevant to Pennington's alibi defense. The prosecutor immediately notified defense counsel, and, the next morning, notified the court that he wanted to call the victim's father as a witness, even though the man had been in the courtroom during the trial thus far. The prosecutor also notified defense counsel that the victim's father was present and could be interviewed prior to his testimony. At that time, both the prosecutor and defense counsel acknowledged that neither had invoked the rule of sequestration at the beginning of trial. Defense counsel then objected to the admissibility of the father's testimony on the basis that the State had failed to include his name on its list of witnesses. After the State asserted that the father's testimony was newly discovered evidence, the court allowed him to testify over Pennington's objection, ruling that the father's presence in the courtroom may affect the credibility, but not the admissibility, of his testimony.[4]

Both the prosecutor and defense counsel then elicited testimony from the victim's father that clearly informed the jury that he had been in the courtroom since the trial began, and defense counsel extensively cross-examined him regarding his observations on the date of the attack. Defense counsel also recalled one of the State's witnesses, a responding police officer, in an attempt to rebut the father's testimony.

(a) As an initial matter, although Pennington argues that the father's testimony improperly undermined his alibi defense, the evidence presented by both the State and the defense shows that the father's testimony about what happened while he was at the victim's home *after* the attack *did not conflict* with Pennington's claim that he was in the process of driving his brother to the hospital *at 3:00 a.m., the time of the attack.* In fact, the father specifically admitted that he had no idea whether anyone had left Pennington's house prior to 3:45 a.m., when he arrived at the victim's home. Thus, Pennington has failed to show any harm that resulted from the admission of the father's testimony.

(b) Moreover, the record supports a finding that the State was not aware that the victim's father had any relevant evidence to provide at trial *until* the parties had presented their opening

---

[4] See *Rakestrau v. State*, 278 Ga. 872, 876 (4) (608 SE2d 216) (2005) ("The decision of whether to allow a witness to testify in violation of the rule of sequestration is within the discretion of the trial court and will not be disturbed on appeal unless such discretion is abused.") (citations omitted).

statements and the other witnesses had testified. It follows that, because the State had not identified the man as a witness until that point in the trial, he would not have been required to stay out of the courtroom *even if* defense counsel had invoked the rule of sequestration at the beginning of trial. Therefore, contrary to Pennington's argument on appeal, any deficiency by trial counsel in failing to request the court to invoke the rule *was not* the cause of any alleged prejudice to Pennington's defense. Consequently, Pennington cannot show that, *but for* such deficiency, there is a reasonable probability that the outcome of his trial would have been different, and this ineffective assistance claim must fail. *Robinson v. State*, 277 Ga. at 75-76; see also *Glass v. State*, 289 Ga. 542, 548 (6) (c) (712 SE2d 851) (2011).

(c) Finally, even if the rule had been invoked and the victim's father had violated the rule by staying in the courtroom, such a violation "generally does not affect the admissibility of the testimony, but may impact the offending witness' credibility." (Citations omitted.) *Rakestrau v. State*, 278 Ga. 872, 876 (4) (608 SE2d 216) (2005). Here, the jury was informed of the father's earlier presence in the courtroom, defense counsel thoroughly cross-examined him, and the court properly instructed the jurors on their role in resolving conflicts in the evidence and in determining the credibility of witnesses, the weight of the evidence, and whether a witness was impeached. Thus, the jury was able to gauge the victim's father's credibility and make a determination as to the weight, if any, it should give to his testimony. Id.; *Glass v. State*, 289 Ga. at 548 (6) (c); *Suggs v. State*, 272 Ga. 85, 87 (3) (526 SE2d 347) (2000). Consequently, Pennington has failed to carry his burden of showing that he was prejudiced by counsel's failure to invoke the rule of sequestration. *Glass v. State*, 289 Ga. at 548 (6) (c).

*Judgment affirmed. Doyle, P. J., and Miller, J., concur.*

DECIDED JANUARY 27, 2012.

*Deborah R. Fluker*, for appellant.
*Daniel J. Porter, District Attorney, William C. Akins, Assistant District Attorney*, for appellee.